**Norma P. HANSON, P.R.,**

v.

**Carleton A. BAKER.**

Supreme Judicial Court of Maine.

Argued Sept. 9, 1987.

Decided Dec. 16, 1987.

Elizabeth G. Stouder, Wendall Large (orally), Richardson & Troubh, Portland, for plaintiff.

Kevin F. Gordon, Jeffrey M. White (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

ROBERTS, Justice.

Norma P. Hanson, individually and as personal representative of the estate of her late husband, Edward Hanson, appeals from the judgment entered in Superior Court, Piscataquis County, in favor of Dr.

Carleton A. Baker and against her claims for wrongful death, conscious pain and suffering and loss of consortium. The sole issue presented on appeal relates to the limitation placed upon the testimony of the plaintiff's medical expert. Because we conclude that the evidentiary rulings were within the sound discretion of the trial court, we affirm the judgment.

## I.

On December 30, 1979, Edward Hanson died as a result of head injuries suffered in a fall at about 9:00 p.m. on December 21. After some delay caused by his wife's fear that he would be angry, Hanson was taken to the Charles Dean Memorial Hospital in Greenville. He was given a complete neurological examination by the defendant, Dr. Baker, at approximately 2:10 a.m. on December 22 and follow-up examinations at 9:00 a.m., noon and 3:00 p.m. Although Hanson's condition had improved earlier, Dr. Baker found no further improvement during the 3:00 p.m. examination. Dr. Baker decided to transfer Hanson to the Eastern Maine Medical Center at Bangor.

Hanson was admitted to the Bangor hospital at 6:20 p.m. on December 22. A computed tomogram (CT) revealed an epidural hematoma and a brain contusion. Dr. Carl Irwin, a neurosurgeon, evacuated the epidural hematoma that same evening. Hanson died on December 30 from massive cerebral edema resulting from the epidural hematoma, contusion and a basilar skull fracture. The plaintiff's suit against Dr. Baker is premised on the theory that Dr. Baker should have immediately transferred Hanson to a hospital with CT capability. She claims that the delay in transfer caused Hanson's death.

In order to establish a causal connection between the delay in the transfer of Hanson and his death, the plaintiff called as her medical expert Dr. Glenn Bricker, a general practitioner from Ashland, New Hampshire. Dr. Bricker is neither a neurosurgeon nor a neurologist. His qualifications include experience as an emergency room physician, as operator of a free-standing emergency facility, and experience in conducting and observing autopsies. The court ruled that Dr. Bricker was not sufficiently qualified to express his opinion as to the effect of any delay in treatment on the cause of Hanson's death, and thus limited his testimony. Moreover, when it became apparent that plaintiff's counsel and the witness would not stay within the bounds of the court's ruling, the court severely restricted the scope and form of counsel's examination of Dr. Bricker.

## II.

Hanson argues that Bricker's training and experience qualify him to describe the kinds of injuries sustained by the decedent, to describe the appropriate procedure to be followed by the emergency physician and, most importantly, to point out the result of Dr. Baker's failure to follow these procedures. In fact, the court did allow Dr. Bricker to describe head injuries, to state the standard of care appropriate for the general practitioner confronted with the symptoms Hanson presented, to explain why it is important that head injuries be treated quickly, and to express his opinion that Baker's conduct failed to meet the standard of care of a general practitioner. The critical ruling made by the court contained two facets: 1) the court excluded Dr. Bricker's opinion that earlier treatment of Hanson's head injury more probably than not would have saved his life, and 2) the court excluded testimony as to the progression of Hanson's injury over time.

By way of an offer of proof out of the presence of the jury, Dr. Bricker testified that early diagnosis and treatment of similar injuries should result in recovery eighty to ninety percent of the time and that 10 hours is near the maximum time that treatment can be delayed without death or serious neurological implications. Dr. Bricker would have testified that the swelling resulting from the left epidural hematoma shifted the brain from left to right and caused the contusion on the right. The treating neurosurgeon, Dr. Irwin, agreed that early diagnosis and treatment is important and that without the contusion Hanson probably would have survived. Ir-

win testified further that the contusion occurred at the time of the fall and was inoperable. He stated that he could only speculate as to the effect of earlier treatment.

We have previously stated that the determination of the qualifications of expert witnesses is reserved to the sound discretion of the trial judge. *Caron v. Pratt*, 336 A.2d 856, 859 (Me.1975). It follows, therefore, that appellate decisions affirming the trial court do not necessarily stand for the proposition that the opposite ruling would constitute error. Many of the cases cited by the plaintiff fall into that category. For example, our holding in *Caron* that the testimony of a medical expert was properly excluded does not mean that its admission would have been error. More helpful to us are cases where the testimony is held to have been erroneously excluded for lack of qualification.

In *Taylor v. Hill*, 464 A.2d 938 (Me.1983) the trial court excluded testimony of a medical expert as to the standard of care applicable to a physician with a different specialty. We held that the nature of the witness's specialty did not matter "as long as the witness is familiar with the standard of care *and qualified to testify about it.*" *Taylor*, 464 A.2d at 942 (emphasis added). In the case before us, the court permitted Dr. Bricker to describe the standard of care applicable to Dr. Baker's handling of Hanson's case and to opine that Baker's conduct was below that standard. Although Dr. Bricker was familiar with the applicable standard of care, the court ruled that Bricker could not describe the time specific progression of bruises and bleeding in the brain or express an opinion that delay in diagnosis caused Hanson's death because he was not qualified to do so.

Contrary to plaintiff's assertion, the court did not apply an improper legal standard in excluding this testimony. The plaintiff asserts that the court limited the testimony of Dr. Bricker because he was not board certified in neurology or neurosurgery. The court, however, did not exclude the testimony because Dr. Bricker was not board certified, but because he lacked education and experience in neurology and neurosurgery. Moreover, the court stated that Dr. Bricker's emergency medicine and autopsy experience was no substitute for experience in the distinct fields of neurology and neurosurgery. The plaintiff also asserts that the court mistakenly believed that the cause of death was not in evidence, and improperly excluded Dr. Bricker's testimony because he relied on facts not in evidence. Although that was the initial ruling, the court later recognized that cause of death was in evidence and repeatedly emphasized the finding that Dr. Bricker's experience and education did not qualify him to testify in the areas excluded.

Finally, the court's subsequent rulings limiting Dr. Bricker's in-court testimony were not an abuse of discretion. These rulings were made to keep Dr. Bricker's responses within the confines of what had already been determined to be admissible testimony. The court acted within its discretion in determining the extent of Dr. Bricker's qualifications, the extent of his permissible testimony and the limitations ultimately placed upon that testimony.

The entry is:

Judgment affirmed.

All concurring.